## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## EVANSVILLE DIVISION

| | |
|---|---|
| JYOTI GAUTAM MURRAY, ALLEN PERRY, and EMANUEL GOLD on behalf of themselves and all others similarly situated, | Case No. 3:24-cv-00131-MPPB-CSW |
| Plaintiffs, | |
| v. | |
| METRO FIBERNET, LLC d/b/a METRONET, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiffs Jyoti Gautam Murray, Allen Perry, and Emanuel Gold by and through their counsel, and for their Class Action Complaint against Defendant Metro Fibernet, LLC d/b/a Metronet ("Metronet"), allege as follows:

## NATURE OF THE ACTION

1.    Plaintiffs bring this proposed class action on behalf themselves and similarly situated consumers against Metronet arising from its bait-and-switch scheme of deceiving consumers with fictitiously low-price advertisements for its broadband internet service and then automatically and unavoidably adding on a

"Technology Services Fee" (the "TSF")[1], a fee that is mis-named, deceptive and which provides no additional service.

2.      The unavoidable and mandatory TSF is, in fact, pure profit.

3.      It's a simple matter of logic: a mandatory fee is *necessarily* part of the price for service, and an advertisement that promises a price lower than that price is false. Rather than simply adding the mandatory TSF to the advertised price of the internet service itself, Metronet secretly tacks on the TSF as line item separate from the basic contract price of the internet service. The reason for charging its TSF in this manner is clear: the only price that consumers consider and rely upon when conducting price comparisons with similar service providers is the internet service's advertised price.

4.      Metronet's TSF is a classic example of a company-imposed "junk fee." Indeed, depending on whichever specific internet service plan a customer selects, Metronet's TSF can represent as much as **43%** of the advertised cost the internet service itself.

5.      Worse yet, Metronet fails to adequately disclose the TSF to its customers in its advertisements, and customers do not discover the true cost of their internet service until after signing up or sometimes even later on when they receive their bill.

6.      Even when customers receive their bill, Metronet obscures the true nature of the fee. Referring to the fee as a "Technology Services Fee" or "Tech Assure

---

[1]      In October 2022, Metronet began referring to its "Technology Service Fee" as the "Tech Assure" fee. Plaintiffs' allegations regard both iterations of Defendant's fee and address the same conduct arising from these fees.

Fee" is deceptive because the fee purportedly provides what reasonable consumers already understand to be part of any internet service: working equipment and, when the equipment fails, service to fix it—"benefits" that are provided by other internet providers without additional charge.[2]

7.    By unfairly obscuring the true cost of its internet service, Metronet deceives consumers and gains an unfair upper hand on competitors that fairly disclose their true costs.

8.    As a result, Plaintiffs and Class members have been injured by Defendant's deceptive and fraudulent practices. Plaintiffs bring this action on behalf of themselves and the putative Class and seek actual damages, punitive damages, and injunctive relief to prevent Defendant from continuing to engage in its illegal practice described herein.

## JURISDICTION

9.    This Court has original jurisdiction over this action, among other reasons, under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because (1) the proposed Class is comprised of at least 100 members; (2) at least one member of the proposed class resides outside of Indiana; and (3) the aggregate claims of the putative class members exceed $5 million, exclusive of interests and costs.

10.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendant is subject to personal jurisdiction here, regularly conducts business in this

---

[2]    The re-named "Tech Assure Fee" is no less misleading, as it implies consumers are receiving some sort of insurance-like product that will "assure" their technology functions. They are not.

District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

**PARTIES**

11.     Plaintiff Jyoti Gautam Murray is a citizen of Minnesota and resident of Rochester, Minnesota.

12.     Plaintiff Allen Perry is a citizen of Kentucky and resident of Lexington, Kentucky.

13.     Plaintiff Emanuel Gold is a citizen of Indiana and resident of Indianapolis, Indiana.

14.     Defendant Metronet is an internet service provider operating in seventeen states with its headquarters located at 3701 Communications Way, Evansville, Indiana 47715. Metronet offers internet, phone, and tv-streaming services for both residential and business accounts. Defendant Metronet may be served at its Business Commercial Registered Agent: Corporation Service Company, which is located at 135 North Pennsylvania Street, Suite 1610, Indianapolis, IN 46203. Defendant's wrongful conduct as described herein emanates from its headquarters in Indiana.

**FACTUAL BACKGROUND AND GENERAL ALLEGATIONS**

A.     **Metronet Deceives Consumers by Advertising its Internet Service at a Fictitiously Low Price, and then Adding a Mandatory Fee**

15.     Metronet is an Internet Service Provider ("ISP") that proclaims itself as "the country's largest and fastest growing privately owned fiber-to-the-home company."[3]

16.     Pertinent to this action, Metronet offers an array of fiber internet plans ranging in price dependent on varying degrees of internet speed (hereinafter collectively referred to as the "Internet Service").

17.     Metronet advertises sham low-prices for its Internet Service to consumers through various marketing channels, including, but not limited to, its website, online promotions, mailing flyers, and billboards.

18.     For example, on its website, Metronet prominently advertises that it provides "the best offers" on a variety of Internet Service Plans:

---

[3]      *See* Metronet, About Us, located at https://www.metronet.com/about-us, (last accessed July 18, 2024).



19.     Once a user selects the "Lowest Price!" option and inputs a geographical region to "Check Pricing," Metronet then states that its lowest Internet Service plan for "basic internet usage" is only $29.95/month:



20.     Since at least 2019 and continuing to the present day, in addition to the price represented in its advertisements, Metronet charges all consumers a flat, monthly fee that Metronet characterizes as a "Technology Services Fee" (the "TSF").

21.     Metronet's TSF has increased over time from at least $9.95 to $12.95 per month and is charged in addition to a consumer's regular monthly charge for their Internet Service. These fee increases are a surreptitious way to increase prices for Internet Service beyond the advertised and contracted-for price.

22.     Indeed, a mandatory fee such as the TSF is necessarily part of the price for service, and an advertisement that promises a price lower than that price is false.

23.     The reason for charging its TSF in this manner is clear: the only price that consumers consider and rely upon when conducting price comparisons with similar service providers is the Internet Service's advertised price.

24.     Metronet's TSF is nothing more than a hidden "junk fee." Metronet advertised a price for its Internet Service that did not include the TSF, but in reality, charged every consumer a higher monthly price that included the TSF. In this way, Metronet was able to advertise an artificially lower price for its Internet Service in order to acquire more customers.

25.     Covertly applied fees like Metronet's TSF are unfair, deceptive, and misleading to consumers because they obstruct their ability to engage in true price comparisons and prevent them from participating in a fair and competitive marketplace. To illustrate, in 2022, Consumer Reports conducted a year-long study digging into the true cost of home internet services offered by numerous ISPs across the country (including Metronet) and concluded that consumers are paying

exorbitant bills for broadband services, including through the assessment of "junk fees," like Metronet's TSF.[4]

26.    The study identified that "Company-Imposed Fees, aka Junk Fees" largely contributed to the widespread consumer confusion as to the true cost of internet services because they "make it difficult for consumers to budget and compare prices with alternative service options":[5]

> ***Fees.*** ISPs charge a wide range of fees that, together, can add up to a significant portion of the overall cost of service and contribute to the confusion around internet pricing. . . . The unavoidable fees are especially problematic because consumers may believe they are government-imposed when, in fact, many are company-imposed and distinguished from the core service price at the provider's discretion. More than a dozen ISPs were found to charge company-imposed fees— also known as junk fees—under names such as "network enhancement fee," "internet infrastructure fee," "deregulated administration fee," and ***"technology service fee."*** They can surprise consumers when they appear on monthly bills, and can enable providers to raise prices without seeming to violate marketing or contractual price commitments.[6]

27.    The danger of junk fees like Metronet's TSF in the broadband market is palpable: "Such fees do a disservice to consumers by muddying the true price of broadband, making it difficult for consumers to compare prices, creating a pretext for providers to advertise low base rates while actually charging higher prices, and enabling providers to raise prices while superficially appearing to honor lower introductory or contractually promised base rates."[7]

---

[4]    *See* Consumer Reports, <u>Broadband Pricing: What Consumer Reports Learned from 22,000 Internet Bills</u>, November 17, 2022, available at: *https://advocacy.consumerreports.org/wp-content/uploads/2022/11/FINAL.report-broadband.november-17-2022-2.pdf* (last accessed July 18, 2024).

[5]    *Id.* at p.3.

[6]    *Id.* at p.4 (emphasis added).

[7]    *Id.* at p. 23.

28.    In fact, in recognition of the potential for deception, the Federal Trade Commission has recently banned this practice. Specifically, the FTC has cautioned against "misleading door openers," calling such price advertisements "deceptive":

> [I]nternet service providers routinely do not include internet service fees, such as installation and activation fees, equipment fees, penalties for exceeding data caps, and early termination fees, in advertised prices, ***and that these fees should be considered as part of the true monthly cost of internet service that should be incorporated into advertised prices*** or prohibited when they are arbitrary or do not reflect added value.

*Trade Regulation Rule on Unfair or Deceptive Fees,* 88 Fed. Reg. 77420, 77432 (proposed Nov. 9, 2023) (to be codified at 16 C.F.R. § 464) (emphasis added).

29.    Metronet's failure to adequately disclose the TSF to its customers in its advertisements, is a "misleading door opener" that unfairly obscures the true cost of its internet service, deceives consumers, and gains an unfair upper hand on competitors that fairly disclose their true Internet Service costs.

**B. The TSF Is Misnamed, Deceptive and Provides No Additional Value**

30.    Having prominently advertised a monthly price that is, by simple logic, false, Metronet then proceeds to lie about the nature and purpose of the fee.

31.    Metronet represents on the Metronet Support page of its website that its TSF is for the purpose of "cover[ing] any service calls or repairs to all Metronet-owned equipment" and "is reflected on your invoice in the amount of up to $12.95 per

month."[8] Metronet further confirms that the TSF is mandatory, as it "is automatically included on each bill and cannot be waived."[9]

32.    But operable, functioning technology is a core part of internet service. It is vital, standard, and reasonably expected by consumers. Without such functionality, there is no internet service.

33.    The unremarkable service of answering a phone call and providing equipment that works in not an add-on benefit; it is the core service.

34.    Metronet's TSF is analogous to a hotel prominently advertising a nightly rate of 90 dollars, then adding a mandatory "bed assurance fee" of $35 dollars, purportedly to "guarantee a bed in your hotel room and ensures sheets not soiled by the previous occupant, of if they are soiled you will be entitled to ask a hotel employee for replacements."

C.    **Plaintiffs' Experiences**

    **Plaintiff Murray**

35.    In or around March 6, 2022 Plaintiff Murray signed up for the Fiber-Speed Internet Service with Metronet for her home located in Rochester, Minnesota.

36.    In reliance on Metronet's representations made in its advertisements and marketing materials regarding the low-price of Defendant's service, Plaintiff Murray opened an account with Metronet and purchased the Fiber-Speed Internet Service for the price of $49.95 per month.

---

[8]    *See* Metronet Support, <u>What is Tech Assure?</u>, available at <u>https://www.metronet.com/support/billing/what-is-tech-assure</u> (last accessed July 18, 2024).
[9]    *Id.*

37.     Plaintiff Murray was exposed to Defendant's representations regarding its Fiber-Speed Internet Service via flyers that were mailed by Metronet to Plaintiff's Murray's apartment rental address in Rochester, Minnesota. Plaintiff Murray was also exposed to Defendant's representations regarding its Fiber-Speed Internet Service on a billboard located in Rochester. To the best of Plaintiff's recollection, Plaintiff Murray received this mailer, and viewed the billboard, in or around March 2022. Plaintiff Murray recalls that neither the flyers nor the billboards advised her of the existence of a "Technology Services Fee" or "Tech Assure Fee."

38.     Based on Metronet's advertisements, Plaintiff Murray selected Metronet's Service because its advertised price of $49.95 was the best price she found after comparing the services offered by similar service providers and she believed she was getting the better value by signing up for Metronet's Internet Service.

39.     However, the true cost of the Internet Service was artificially inflated as a result of Defendant's assessment of its mandatory TSF in the amount of $12.00 per month.[10]

40.     Plaintiff Murray did not discover the TSF until she received her monthly bill reflecting the Fee, and even then, she did not know why she was being charged it or what the fee was for. Indeed, Metronet fraudulently concealed the nature of the fee by describing it as a "Technology Services Fee," when in fact, no "service" was being provided and it instead represents disguised profit.

---

[10]     Metronet's TSF increased to $12.95 in approximately June 2024.

11

41.     Plaintiff Murray has never made any service calls to Metronet regarding her Internet Service.

42.     Plaintiff Murray would not have signed up for Metronet's Internet Service had she known that the true cost of its Service was not truly $49.95 per month.

43.     If Plaintiff Murray had known the true cost of the Metronet Internet Service, she would have chosen another service provider. Plaintiff Murray cancelled her service with Metronet on March 5, 2025.

**Plaintiff Perry**

44.     In or around April 18, 2024, Plaintiff Perry signed up for the Fiber-Speed Internet Service with Metronet for his home located in Lexington, Kentucky.

45.     In reliance on Metronet's representations made in its advertisements and marketing materials regarding the low-price of Defendant's service, Plaintiff Perry opened an account with Metronet and purchased the Fiber-Speed Internet Service for a promotional discounted price of $29.95 per month for the first 12 months.

46.     Plaintiff Perry was first exposed to Defendant's representations regarding its Fiber-Speed Internet Service via an online promotion between January 2024 – April 2024. During that time period, Plaintiff Perry used Google to research internet providers in his area from his home in Lexington, Kentucky.  Metronet's online advertisement regarding its Fiber-Speed Internet Service came up as one of several options in his area. He viewed the online promotional price of $29.95 on

Metronet's website. Plaintiff Perry recalls that the promotion did not advise him of the existence of a "Technology Services Fee" or "Tech Assure Fee."

47.     Based on Metronet's online advertisements, Plaintiff Perry selected Metronet's Internet Service because its advertised price of $29.95 was the best price he found after comparing the services offered by similar service providers and he believed he was getting the better value by signing up for Metronet's Internet Service.

48.     However, the true cost of the Service was artificially inflated as a result of Defendant's assessment of its mandatory TSF in the amount of $12.95 per month.

49.     Plaintiff Perry did not learn of the TSF until he signed up with Metronet over the phone and called to set up installation and even then, he did not know why he was being charged it or what the fee was for. Indeed, Metronet fraudulently concealed the nature of the fee by describing it as a "Tech Assure Fee," when in fact, the fee does not "assure" any "tech" and instead represents disguised profit.

50.     Plaintiff Perry has never made any service calls to Metronet regarding his Internet Service.

51.     Plaintiff Perry would not have signed up for Metronet's Internet Service had he known that the true cost of its Service was not truly $29.95 per month.

52.     If Plaintiff Perry had known the true cost of the Metronet Internet Service, he would have chosen another service provider.

**Plaintiff Gold**

53.     In or around March 20, 2023, Plaintiff Gold signed up for the Fiber-Speed Internet Service with Metronet for his home located in Indianapolis, Indiana.

54.    In reliance on Metronet's representations made in its advertisements and marketing materials regarding the low-price of Defendant's service, Plaintiff Gold opened an account with Metronet and purchased the Fiber-Speed Internet Service for a promotional discounted price of $29.95 per month for the first 12 months.

55.    Plaintiff Gold was first exposed to Defendant's representations regarding its Fiber-Speed Internet Service via a flyer that Metronet sent to his home in Indianapolis, Indiana in 2022:



56.    Plaintiff Gold received several more direct mailers to his home with Defendant's representations regarding its Fiber-Speed Internet Service. None of these mailers mentioned the mandatory TSF fee.

57.    Sometime between January - March 2023, Plaintiff Gold received the following flyer that Metronet mailed to his home in Indianapolis, Indiana:



58.    The promotion did not advise him of the existence of a "Technology Services Fee" or "Tech Assure Fee."

59.    Based on Metronet's pricing representations on these flyers and the several flyers that he received via mail prior, Plaintiff Gold visited Metronet's website. He viewed the online promotional price of $29.95 on Metronet's website. He selected Metronet's Internet Service because its advertised price of $29.95 was the best price he found after comparing the services offered by similar service providers and he believed he was getting the better value by signing up for Metronet's Internet Service.

60.    However, the true cost of the Service was artificially inflated as a result of Defendant's assessment of its mandatory TSF in the amount of $12 per month and later, $12.95 per month.

61.    Plaintiff Gold did not learn of the TSF until he signed up with Metronet and even then, he did not know why he was being charged it or what the fee was for.

Indeed, Metronet fraudulently concealed the nature of the fee by describing it as a "Tech Assure Fee," when in fact, the fee does not "assure" any "tech" and instead represents disguised profit.

62.    Plaintiff Gold has never made any service calls to Metronet regarding his Internet Service.

63.    Plaintiff Gold would not have signed up for Metronet's Internet Service had he known that the true cost of its Service was not truly $29.95 per month.

64.    If Plaintiff Gold had known the true cost of the Metronet Internet Service, he would have chosen another service provider. Plaintiff Gold cancelled his service with Metronet on March 27, 2025.

**D.    Metronet Continues its Unlawful Misconduct Despite Consumer Complaints**

65.    Plaintiffs' experiences are far from outliers, as various complaints online demonstrate that consumers have similarly been misled by Metronet's misconduct:



> r/Metronet · 3 yr. ago
> dlflannery
>
> ## Deceptive pricing ("Technology Service Fee")
>
> As far as I can tell, Metronet adds a $9.95 "technology Service Fee" to the advertised price of **every** account. Here is a quote from their website:
>
> "Our Technology Service Fee is a mandatory flat fee covering any service call, broken set-top boxes, router, or any other MetroNet owned equipment. If it's our equipment or our wiring, inside or outside your home, we'll fix it or replace it at no cost to you. Likewise, you will never be charged if a technician has to visit your home for any reason."
>
> This is very deceptive marketing as most new customers switch from other providers and a price comparison is frequently a primary factor in this process.

 **imakesawdust** · 3y ago

What kills me is this mandatory fee isn't mentioned on the flyers they send to households trying to get them to switch from cable.

By the time I factor in the mandatory service fee and the static IP fee (so that I can connect to my home security server from, say, the office), that $60/month price is suddenly $80/month and the whole thing looks a lot less enticing.

 **Capstan379** · 10mo ago

This is deceptive! If there is such fees, mention at the time of installation! I felt betrayed! Trusts is an issue!

 **Initial Complaint**
01/26/2022

**Complaint Type:** Billing Issues
**Status:** Answered ❓

I received a billing for more than I usually pay, it was listed as a technology fee, when I inquired I was told this" *** (MetroNet) Jan 25, 2022, 19:03 EST Hello ***, Thank you for reaching out tonight. The technology service fee is a mandatory fee that every customer and employee has. It covers truck rolls, repairs, and replacements. If you have any additional questions please feel free to reach out to us. You can also reach us via phone or on the online chat feature on our website at www.metronetinc.com. Thank you for being a MetroNet customer, I hope you have a great day! Sincerely, ****** ** MetroNet Customer Care Advocate XXX-XXX-XXXX Metronet I was not told I would be paying this fee, nor have I ever paid it before- and feel that charges shouldnt be added for regular company expense



**Michael**
Jacksonville, NC



Verified purchase

Customer Service     Installation & Setup     Staff

Reviewed Nov. 1, 2023

This was one of the biggest bait and switches I've ever experienced. I had a salesman come through my neighborhood to promote the Metronet service which had been installed through my neighborhood a few months early. The salesman told me the service would be 60 for 1-gig speed internet which was significantly cheaper than what I was paying for with Specturm. I was also told that price would be there for 24 months. I was told there would be a 50 install fee cost. The installation occurred about a week later at the end of October 2023. Everything went fine and service was good but when I got the first invoice. It was \$156. The 1-gig was 90, not 60 and there was a 12 tech fee that was not conveyed to me. The install fee was 50 so at least they got that right.



**Craig**
Bettendorf, IA



Customer Service     Sales & Marketing     Price

Reviewed Nov. 20, 2020

Nowhere close to the speed advertised. Sign up discount offers were "accidentally" not included in billing. Called in about oversight and they still didn't fix the billing the second month. Base charge of \$49.95 does NOT include the mandatory technology fee of \$9.95. They assumed I wanted a mailed statement at the cost of \$4.95 a month. They also assumed I wanted a second WiFi for another \$7.95 a month. End of the day the lowest bill you can get is about \$63.00, a far cry from the advertised \$49.95. Don't bother writing a letter to the company president as he does not bother to respond. Look elsewhere for a provider.



66.     In addition to these online complaints, consumers have filed dozens of complaints with the Federal Communications Commission and with state attorney generals and/or other consumer agencies regarding Metronet's deceptive sales practices and assessment of the TSF. *See* Exhibit A. (attaching examples of complaints lodged with the FCC and state attorney generals and/or consumer agencies).

**CLASS ALLEGATIONS**

67.     Pursuant to Federal Rule of Civil Procedure 23 ("Rule 23"), Plaintiffs bring this action individually on behalf of themselves and as a class action of similarly situated persons (the "Classes"), as specifically defined below:

> All consumers who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, held an account for an Internet Service with Metronet and were assessed a

Technology Services Fee and/or Tech Assure Fee (the "Nationwide Class").

All consumers in Minnesota who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, held an account for an Internet Service with Metronet and were assessed a Technology Services Fee and/or Tech Assure Fee (the "Minnesota Subclass").

All consumers in Kentucky who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, held an account for an Internet Service with Metronet and were assessed a Technology Services Fee and/or Tech Assure Fee (the "Kentucky Subclass").

All consumers in Indiana who, within the applicable statute of limitations preceding the filing of this action to the date of class certification, held an account for an Internet Service with Metronet and were assessed a Technology Services Fee and/or Tech Assure Fee (the "Indiana Subclass").

68.     Excluded from the Class is Defendant, any entities in which they have a controlling interest, any of their parents, subsidiaries, affiliates, officers, directors, employees, and members of such persons' immediate families, and the presiding judge(s) in this case, and their staff. Plaintiffs reserve the right to expand, modify, or amend the class definition, including the addition of one or more subclasses, in connection with their motion for class certification, or at any other time, based upon, *inter alia,* changing circumstances and/or new facts obtained during discovery.

69.     This case is appropriate for class treatment because Plaintiffs can prove the elements of their claims on a class wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

70.    **Numerosity**. At this time, Plaintiffs do not know the exact size of the Class; however, due to the nature of the trade and commerce involved, Plaintiffs believe that the Class members are well into the thousands, and thus, are so numerous that joinder of all members is impractical. The number and identities of the members of the Class is administratively feasible and can be determined through appropriate discovery in the possession of the Defendant.

71.    **Common Questions of Law and Fact Predominate**: There are many questions of law and fact common to Plaintiffs and the Class, and those questions substantially predominate over any questions that may affect individual Class members. Common questions of law and fact include:

   a.    Whether during the class period, Defendant deceptively misrepresented and/or omitted the true cost of its Internet Service to consumers through the addition of its mandatory TSF;

   b.    Whether Defendant's alleged misconduct misled or had the tendency to mislead consumers;

   c.    Whether Defendant engaged in unfair, unlawful, and/or fraudulent business practices under the laws asserted;

   d.    Whether Defendant fraudulently concealed the nature of the fee;

   e.    Whether Plaintiffs and members of the Class were harmed by Defendant's misrepresentations and omissions;

   f.    Whether Defendant was unjustly enriched;

g.    Whether Plaintiffs and the Class have been damaged, and if so, the proper measure of damages; and

h.    Whether an injunction is necessary to prevent Defendant from continuing to engage in the wrongful conduct described herein.

72.    **Typicality**: Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class have been similarly affected by the actions of Defendant as alleged above.

73.    **Adequacy of Representation**: Plaintiffs are committed to pursuing this action and have retained counsel competent and experienced in prosecuting and resolving consumer class actions. Plaintiffs will fairly and adequately represent the interests of the Class and do not have any interests adverse to those of the Class.

74.    **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Individual joinder of all members of the Class is impractical. Even if individual Class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendant's common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all Class members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system and protects the rights of the Class members.

75.     Class action treatment is proper, and this action should be maintained as a class action because the risks of separate actions by individual members of the Class would create a risk of: (a) inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Metronet as the party opposing the Class; and/or (b) adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interests of other Class members not party to the adjudication or would substantially impair or impede their ability to protect their interests.

76.     Plaintiffs and the members of the Class suffered and will continue to suffer harm as a result of Defendant's wrongful conduct. Metronet has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

**FIRST CLAIM FOR RELIEF**
**Violation of the Indiana Deceptive Consumer Sales Act,**
**Ind. Code § 24-5-0.5-1, *et seq.***
**(On behalf of Plaintiffs and the Nationwide Class or in the alternative, on behalf of Plaintiff Gold and the Indiana Subclass)**

77.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

78.     Plaintiffs bring this action on behalf of Plaintiffs and the nationwide class. Application of Indiana law to the Nationwide Class with respect to Plaintiffs' and class members' claims is neither arbitrary nor fundamentally unfair both because Defendant's wrongful conduct emanated from Indiana and because Indiana has significant contacts and a significant aggregation of contacts that create a state

interest in the claims of Plaintiffs and the Nationwide Class. Specifically, Indiana has a significant interest of regulating the conduct of businesses operating within its borders. Indiana, which seeks to protect the rights and interests of Indiana and all residents and citizens of the US against a company headquartered and doing business in Indiana has an interest in Plaintiffs' claims. Indeed, Indiana is the "nerve center" of Defendant's business activities—the place where its high-level officers direct and control the company's activities, including decisions relating to marketing and the assessment of the TSF. Metronet's corporate decisions regarding its misrepresentation of the price of its Internet Service was made from Indiana, and its tortious conduct emanated from Indiana. Under choice of law principles, therefore, Indiana law applies to Plaintiffs' claims, even though they are non-resident consumer plaintiffs.

79.    The purposes and policies of the Indiana Deceptive Consumer Sales Act (the "DCSA"), Indiana Code § 24-5-0.5-1 to -12, are to:

     a.    Simplify, clarify, and modernize the law governing deceptive and unconscionable consumer sales practices;

     b.    Protect consumers from suppliers who commit deceptive and unconscionable consumer sales practices; and

     c.    Encourage the development of fair consumer sales practice.

Ind. Code § 24-5-0.5-1(b).

80.    The General Assembly has instructed courts to construe the DCSA liberally to promote these purposes and policies. Ind. Code § 24-5-0.5-1(a).

81.    Metronet is a "supplier" as defined in the DCSA because it is a seller or other person who regularly engages in or solicits consumer transactions, which are defined to include sales of personal property, services, and intangibles that are primarily for a personal, familial, or household purpose, such as those at issue in this action. Ind. Code § 24-5-0.5-2(1), (3).

82.    This matter involves a "consumer transaction," defined as "a sale, lease, assignment, award by chance, or other disposition of an item of personal property, real property, a service, or an intangible . . . to a person for purposes that are primarily personal, familial, charitable, agricultural, or household, or a solicitation to supply any of these things. Ind. Code § 24-5-0.5-2(a).

83.    The DCSA provides that "[a] supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of [the DCSA] whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations." Ind. Code § 24-5-0.5-3(a).

84.    The DCSA further provides:

Without limiting the scope of subsection (a) the following acts, and the following representations as to the subject matter of a consumer transaction, made orally, in writing, or by electronic communication, by a supplier, are deceptive acts:

a. That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have.

b. That such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not. . . .

Ind. Code § 24-5-0.5-3.

85. Metronet committed deceptive acts, including, but not limited to:

a. Misrepresenting its TSF;

b. Misrepresenting the true cost of its Internet Service; and

c. Covertly adding its TSF to its Internet Service without adequate or fair disclosure.

86. Metronet's violations were willful and were done was part of a scheme, artifice, or device with intent to defraud, mislead, and therefore are incurable deceptive acts under the DCSA.

87. The DCSA provides that "[a] person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater. The court may increase damages for a willful deceptive act in an amount that does not exceed the greater of: (i) three (3) times the actual damages of the consumer suffering the loss; or (ii) one thousand dollars ($1,000). Ind. Code § 24-5-0.5-4(a).

88.     The DCSA provides that "[a]ny person who is entitled to bring an action under subsection (a) on the person's own behalf against a supplier for damages for a deceptive act may bring a class action against such supplier on behalf of any class of persons of which that person is a member . . . ." Ind. Code § 24-5-0.5-4(b).

89.     Had Plaintiffs and the members of the Class been aware that they were going to be charged the TSF, Plaintiffs and members of the Class would not have entered into such a relationship with Metronet and would not have paid the TSF.

90.     As a direct and proximate result of Defendant's unfair and deceptive acts and practices in violation of the DCSA, Plaintiffs and members of the Class have paid more for Metronet's service than they should have and have suffered monetary damages for which Defendant is liable.

91.     Plaintiffs and members of the Class seek actual damages plus interest on damages at the legal rate, as well as all other just and proper relief afforded by the DCSA. As redress for Defendant's repeated and ongoing violations, Plaintiffs and members of the Class are entitled to, *inter alia,* actual damages, treble damages, attorney's fees, and injunctive relief.

**SECOND CLAIM FOR RELIEF**
**Alternative Claim for Relief for Violation of**
**the Minnesota Prevention of Consumer Fraud Act,**
**Minn. Stat. § 325F.68, *et seq.***
**(On behalf of Plaintiff Murray and the Minnesota Subclass)**

92.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

93.     This alternative claim for relief is asserted on behalf of Plaintiffs and the Class under the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq.*, to the extent the Court declines to apply Indiana law nationwide.

94.     Plaintiffs and Metronet are "persons" as defined in the Minnesota Prevention of Consumer Fraud Act, section 325F.68(3).

95.     Metronet's Internet Service constitutes "merchandise" as defined in Minnesota Prevention of Consumer Fraud Act, section 325F.68(2).

96.     The Minnesota Prevention of Consumer Fraud Act provides that "[t]he act, use, or employment by any person of any fraud, unfair or unconscionable practice, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable . . ." Minn. Stat. § 325F.69(1).

97.     Metronet engaged in unfair and deceptive acts and practices relating to the imposition of the challenged fees, in violation of Minn. Stat. § 325F.69. Specifically, Metronet misrepresents to consumers its practice of adding mandatory, useless fees, including its TSF, which artificially inflates the true cost of its Internet Service, as alleged above.

98.     Metronet engaged in such acts and omissions intended that Plaintiffs and the Class would rely on their misrepresentations and omissions in signing up for an Internet Service with Metronet.

99.    Plaintiffs and the Class relied on Metronet's misrepresentations and omissions to their detriment.

100.    Metronet's acts and practices proximately caused injury to Plaintiffs and the Class, and they are entitled to, *inter alia,* damages, injunctive relief, declaratory relief, costs and attorneys' fees pursuant to Minn. Stat. § 325F.70(3).

<u>**THIRD CLAIM FOR RELIEF**</u>
**Alternative Claim for Relief for Violation of**
**the Minnesota Deceptive Trade Practices Act**
**Minn. Stat. § 325D.44, *et seq.***
**(On behalf of Plaintiff Murray and the Minnesota Subclass)**

101.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

102.    This alternative claim for relief is asserted on behalf of Plaintiffs and the Class under the Minnesota Deceptive Trade Practices Act, Minn. Stat. § 325D.44, *et seq.*, to the extent the Court declines to apply Indiana law nationwide.

103.    The Minnesota Deceptive Trade Practices Act declares that engaging in "conduct which . . . creates a likelihood of confusion or of misunderstanding," constitutes a deceptive trade practice. Minn. Stat. § 325D.44(14).

104.    The Minnesota Deceptive Trade Practices Act also prohibits "represent[ing] that. . . services have. . . characteristics. . . that they do not have" and "advertis[ing]. . . services with intent not to sell them as advertised[.]" Minn. Stat. § 325D.44(5), (9).

105.    Metronet engaged in deceptive acts and practices relating to the imposition of its TSF, in violation of Minn. Stat. § 325D.44. Specifically, Metronet

misrepresents in its advertisements the true price of its Internet Service by adding on its mandatory TSF, as alleged above.

106.  Metronet engaged in such acts and omissions intended that Plaintiffs and the Class would rely on their misrepresentations and omissions.

107.  Plaintiffs and the Class relied on Metronet's misrepresentations and omissions to their detriment.

108.  Metronet knew that their trade practices were deceptive and willfully, intentionally, and/or negligently engaged in them.

109.  Metronet's acts and practices proximately caused injury to Plaintiffs and the Class, and they are entitled to, *inter alia,* injunctive relief, declaratory relief, attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF
### Alternative Claim for Relief for Violation of the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. § 367.110, *et seq.* (On behalf of Plaintiff Perry and the Kentucky Subclass)

110.  Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

111.  This alternative claim for relief is asserted on behalf of Plaintiffs and the Class for violation of the Kentucky Consumer Protection Act, Ky. Stat. § 367.110, *et seq.*, to the extent the Court declines to apply Indiana law nationwide.

112.  The Kentucky Consumer Protection Act declares unlawful any "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce[.]" Ky. Stat. § 367.170(1).

113.    Metronet engaged in deceptive acts and practices relating to the imposition of its TSF, in violation of Ky Stat. § 367.170(1). Specifically, Metronet misrepresents in its advertisements the true price of its Internet Service by adding on its mandatory TSF, as alleged above.

114.    Metronet engaged in such acts and omissions intended that Plaintiffs and the Class would rely on their misrepresentations and omissions.

115.    Plaintiffs and the Class relied on Metronet's misrepresentations and omissions to their detriment.

116.    Metronet knew that their trade practices were deceptive and willfully, intentionally, and/or negligently engaged in them.

117.    Metronet's acts and practices proximately caused injury to Plaintiffs and the Class, and they are entitled to, *inter alia,* damages, injunctive relief, declaratory relief, attorneys' fees and costs pursuant to Ky. Stat. § 367.220.

### FIFTH CLAIM FOR RELIEF
### Unjust Enrichment
### (On behalf of Plaintiffs and the Nationwide Class, Minnesota Subclass, Kentucky Subclass, and Indiana Subclass)

118.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

119.    To the detriment of Plaintiffs and the Class, Defendant has been, and continues to be, unjustly enriched as a result of its wrongful conduct alleged herein.

120.    Plaintiffs and the Class conferred a benefit on Defendant.

121.    Defendant unfairly, deceptively, unjustly, and/or unlawfully accepted said benefits, which under the circumstances, would be unjust to allow Defendant to retain.

122.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

123.    Plaintiffs and the Class, therefore, seek disgorgement of all wrongfully obtained fees received by Defendant as a result of its inequitable conduct as more fully stated herein.

**SIXTH CLAIM FOR RELIEF**
**Negligent Misrepresentation**
**(On behalf of Plaintiffs and the Nationwide Class, Minnesota Subclass, Kentucky Subclass, and Indiana Subclass)**

124.    Plaintiffs incorporate by reference the proceeding paragraphs as if fully set forth herein.

125.    Defendant has negligently represented that its broadband internet service is a low price.

126.    Defendant, in promoting and marketing its broadband internet service to consumers, had a duty of care to inform customers of the true costs of having its internet service. This is a material fact that was only known by Defendant, but it was not disclosed to consumers.

127.    Defendant made misrepresentations of material fact that were false.

128.    Defendant knew its misrepresentations about internet costs were material to the reasonable consumer.

129.   Defendant knew and intended that Plaintiffs and members of the Classes would rely upon their misrepresentations when deciding whether or not to sign up for its internet service.

130.   Defendant was negligent because it knew or should have known that its representations in advertising materials about the cost of its internet were inaccurate and misleading.

131.   Defendant omitted the fact that as a matter of secret policy, TSF charges were not listed on the advertisements, but were added later over and above those represented in marketing materials about the cost of its internet.

132.   Plaintiffs and members of the Classes justifiably acted in reliance upon Defendants' false and misleading statements by signing up for Defendant's internet at the represented cost.

133.   Neither Plaintiffs nor any reasonable consumer would have signed up for Defendant's internet if they had known of the true cost of it—a cost Defendant alone was aware of and actively misrepresented.

134.   As a direct and proximate result of Defendant's misrepresentations, Plaintiffs and members of the Classes were induced into signing up for Defendant's internet service and have been harmed and suffered actual damages in the amount of the TSF fees paid in excess of those expressly represented.

135.   Plaintiffs seek all available remedies, damages, and awards as a result of Defendant's negligent misrepresentations.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court:

(a)    Certification for this matter to proceed as a class action on behalf of the Class;

(b)    Declaring Defendant's practices to be unlawful;

(c)    For declaratory and injunctive relief as set forth above;

(d)    For an order requiring Defendant to disgorge and make restitution of all monies it acquired by means of the unlawful practices set forth above;

(e)    For an order for compensatory damages, punitive damages, and statutory damages according to proof;

(f)    For reasonable attorneys' fees and costs of suit;

(g)    For pre-judgment interest; and

(h)    Awarding such other and further relief as this Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated: May 15, 2025                      Respectfully submitted,

_/s/ Tyler B. Ewigleben_____
**JENNINGS PLLC**
Tyler B. Ewigleben; Bar No. 36450-49
Christopher D. Jennings*
500 President Clinton Avenue
Suite 110
Little Rock, AR 72201
Telephone: (317)-695-1712

34

tyler@jenningspllc.com
chris@jenningspllc.com

**KALIELGOLD PLLC**
Sophia Gold*
sgold@kalielgold.com
490 43rd Street, No. 122
Oakland, California 94609
Tel: (202) 350-4783

*Attorneys for Plaintiffs*

*\*Pro hac vice*